# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# <u>SOUTHERN DIVISION</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) Case No. 2:24-cr-00283-AMM-NAD |
| | ) |
| **TERRANCE ALONZO PRUITT,** | ) |
| | ) |
| **Defendant.** | ) |

### <u>UNITED STATES' OMNIBUS MOTIONS *IN LIMINE*</u>

The facts in this case are straightforward: In September 2023, the defendant obtained Power of Attorney over his aunt, B.W., who has dementia. The Power of Attorney form was notarized in a parking lot by one of the defendant's high school classmates. The defendant took this Power of Attorney form to Wells Fargo and had himself added to B.W.'s bank accounts. The defendant then changed the address on these accounts from B.W.'s address to his address, removed the Pay on Death beneficiaries from B.W.'s savings account, and then on December 9, 2023, made two separate transfers of $500,000 and $50,000 from B.W.'s accounts to his own bank accounts. These transfers came after the defendant had already made three other transfers (for $250,000; $39,000; and $412,000) but then moved those funds back to B.W.'s accounts the same or next day.

For the $500,000 transfer and the $50,000 transfer, the defendant has been charged with two counts of wire fraud. The ending daily balance of the defendant's

checking account just before he made these two transfers was $314.77. This fact, along with the fact that he listed more than $244,000 in liabilities on a bankruptcy petition he filed in June 2023, provides an obvious motive for the defendant's crimes.

When confronted about his actions, the defendant told three different stories to three different people. To his cousin, C.L., the defendant said he took the money because he did not want the money going to B.W.'s brother. To the Jefferson County Conservator, the defendant claimed that he moved the money because he was suspicious of others and that B.W. intended to give him the money anyway, so he used a POA instead of a will. And to an FBI agent investigating the case, the defendant said that he moved the money to keep it from his 71-year-old cousin, T.L., who was allegedly getting into the victim's accounts and had created a "fake password." All three of these individuals will testify at trial about these incompatible excuses.

In advance of trial, the United States requests rulings as to the following issues. First, the United States seeks a ruling regarding the admissibility of various documents. Second, the United States seeks rulings precluding the defense from presenting inadmissible evidence or argument: (1) regarding the repayment of the stolen funds; (2) using FBI 302s improperly, or (3) promoting jury nullification.

I.     **Admissible Evidence**

Federal Rule of Evidence 902 sets out several types "of evidence that are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902. Additionally, records offered under Rule 902(11) are not only authenticated, but also excepted from the hearsay rule. *See* Fed. R. Evid. 803(6)(D).

The United States intends to offer various exhibits under Rules 902(4) and 902(11), including court records for which the United States has obtained certificates according to Rule 902(4), as well as business records for which the government has obtained Rule 902(11) certificates. The government has obtained the necessary certifications to eliminate the need for a live witness to authenticate these records at trial, and those certifications have been provided to the defense. *See* Fed. R. Evid. 902(4), (11). The authenticity and non-hearsay nature of these records are therefore established for purposes of admission at trial. *See* Fed. R. Evid. 902; 803(6)(D). The United States has conferred with counsel for the defendant, who stated that he does not have any objection to the authenticity of these records for purposes of trial.

II.    **Irrelevant, Improper, and Inadmissible Topics**

Like other parties, criminal defendants "must comply with the procedural and evidentiary rules designed to facilitate a search for the truth." *United States v. Ruan*, 966 F.3d 1101, 1154 (11th Cir. 2020) (cleaned up). A defendant has the right to

present a defense, but not "to place before the jury irrelevant or otherwise inadmissible evidence." *United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989). A defendant is entitled to present evidence only if relevant to an element of a charge or an affirmative defense. *See United States v. Hurn*, 368 F.3d 1359, 1365-66 (11th Cir. 2004); *United States v. Masferrer*, 514 F.3d. 1158, 1161 (11th Cir. 2008) (affirming exclusion of evidence that did "not bear a logical relationship to an element of the offense or an affirmative defense" (cleaned up)).

Applying those principles here, the Court should preclude the categories of inadmissible evidence and argument described below.

### A. The Court should preclude irrelevant evidence regarding repayment of the stolen funds.

After the defendant stole more than $500,000 from his elderly aunt's bank accounts, the Temporary Conservator for his elderly aunt brought a Petition for Elder Abuse Protection Order in the Circuit Court of Jefferson County, Alabama in *Gregory H. Hawley, et al. v. Terrance A. Pruitt*, Case No. 01-CV-2024-900439. The lawsuit alleged that Pruitt had improperly taken more than $510,000 from his elderly aunt and asked the court to freeze the funds at issue and then return them to Pruitt's elderly aunt.

On February 29, 2024, the date the final hearing was to occur, the defendant agreed to a Final Consent Judgment, agreeing that the funds at issue that had been frozen—approximately $505,000—could be returned to his elderly aunt. This left a

4

balance of $5,392.92, which the defendant mailed to the Conservator on or about September 27, 2024.

The United States seeks to exclude evidence of the repayment of funds back to the victim and the corresponding state court litigation. "Repayment in the face of litigation does not show a lack of fraudulent intent." *United States v. Suba* 132 F.3d 662, 677 (11th Cir. 1998) (rejecting the defendant's argument that "no fraud was proven because the loan was repaid"); *see also United States v. Sirang*, 70 F.3d 588, 595 (11th Cir. 1995) ("Partial payment under compulsion of litigation does not tend to prove lack of fraudulent intent, and under these circumstances such an instruction would have been misleading.").

Even when not offered in the face of litigation, evidence of repayment or an intent to repay is irrelevant in determining a defendant's criminal intent. *See United States v. Scott*, 701 F.2d 1340, 1347 (11th Cir. 1983). In *Scott*, the defendant was charged with making false statements and mail fraud based on credit applications he submitted, and he attempted to introduce evidence that he had made payments toward the accounts at issue and that these accounts were current. *Id.* at 1364. Like the defendant may try to do here, the defendant in *Scott* argued "that because he repaid the accounts he was not guilty of mail fraud, because he did not intend to defraud." *Id.* at 1347. The district court rejected this argument and excluded this repayment evidence, and the Eleventh Circuit affirmed, noting that "'[h]e did,

5

however, intend to falsify material documents." *Id.* The Eleventh Circuit explained that repayment evidence is irrelevant to prove intent:

> It was his intentional falsification on the documents which established the requisite intent of the statute. Whether the accounts were current, or whether he repaid the accounts is immaterial as to whether he intentionally falsified the documents. This is similar to the intent question in embezzlement cases. If a person in lawful possession of another's property converts it, but all the while had the intent to replace it with substitute property, he or she is still guilty of embezzlement.

*Id.*

In *United States v. Morales*, the Eleventh Circuit again held that evidence of repayment or an intent to repay is irrelevant, as the intent to commit the crime is shown when the criminal act occurs:

> A reasonable expectation of making covering deposits does not negate an actual, earlier intent to defraud, which existed at the time the checks were cashed. The evidence shows that Appellant intended to obtain cash for bad checks, and this unlawful intent is not eliminated by showing that Appellant intended to make the checks good later.

978 F.2d 650, 655 (11th Cir. 1992). And in *United States v. Fields*, the Eleventh Circuit reaffirmed that a "defendant's intention to repay stolen money, and 'even actual repayment,' is not a defense . . . [;] the necessary intent is established by knowingly participating in a fraudulent transaction, whether or not there was repayment or an intent to repay." 327 F. App'x 133, 135 (11th Cir. 2009) (excluding repayment evidence relating to a charge under 18 U.S.C. § 641).

6

The United States anticipates that the defendant may attempt to excuse his conduct and negate his criminal intent by noting that the stolen funds at issue have been returned to his elderly aunt—through the state court litigation in February 2024 and by the check he recently sent to the Conservator in September 2024. But as *Scott*, *Morales*, and *Fields* show, evidence that the victim has been repaid is irrelevant. Repaying stolen funds only after being caught is irrelevant to Pruitt's mental state when he stole the victim's funds in December 2023. It would do nothing but improperly urge the jury to nullify, suggesting that because the stolen funds have been returned to the victim, the defendant did not have any fraudulent intent. But that is not the law. The defendant here is like the defendants in *Suba* and *Sirang*, who repaid the funds at issue only in the face of litigation. But such repayment—especially in the fact of litigation—is irrelevant to the issue of intent. *See Suba* 132 F.3d at 677; *Sirang*, 70 F.3d at 595. Accordingly, the Court should preclude the defense from eliciting testimony regarding repayment and the state court litigation during cross-examination of the government's witnesses or direct examination of their own witnesses, and from making any references to or arguments about such irrelevant evidence.

    **B.**    **The Court should prevent the defense from improperly using FBI 302s.**

During the course of its investigation, the FBI created a number of reports summarizing interviews with witnesses in this case. These reports are known as FD-

302s (commonly, "302s"). The United States has produced copies of these 302s to the defense, even though this goes beyond the United States' discovery obligations. *See United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).

However, it would be improper for the defense to attempt to impeach a witness by confronting the witness with a 302 of that witness's interview, as the witness did not write the 302 and has never seen it. *See id.*; *United States v. Langford*, No. 08-245, 2009 WL 10671369, at *23 (N.D. Ala. Jul. 2, 2009) (explaining that *Jencks* material is designed to give the opposing side a witness's statements for purposes of impeachment, and that this does not include "an agent's informal description of a witness's testimony"); *United States v. Rizza*, No. 14-cr-02, 2014 WL 3747624, at *2 (M.D. Fla. Jul. 29, 2014) (granting government's motion in limine to preclude improper use of 302s to impeach witnesses, and collecting cases for the proposition that defendants may not use 302s "to impeach witnesses because they are not statements of the witnesses themselves").

While the defense could ask a witness questions about information that appears in a 302 of a prior interview of that witness (assuming otherwise admissible), and while counsel could ask the witness whether that person had previously made particular statements during that interview (again, assuming otherwise admissible), counsel cannot confront the witness (who did not write the 302 or adopt it) with the 302 itself or have the witness read the 302 into the record. Apart from the limited

8

permissible usage of 302s, the United States asks the Court to prevent the defense from confronting the witness with a copy of a 302 or asking the witness to read a portion of a 302 into the record.

    **C.    The Court should preclude the defense from inviting jury nullification.**

The jury's "duty is to apply the law as interpreted and instructed by the court." *United States v. Trujillo*, 714 F.2d 102, 105 (11th Cir. 1983). Though the jury has the "de facto power to refuse to apply the law as instructed by the court, the exercise of such power is in dereliction of the jury's sworn duty." *United States v. Funches*, 135 F.3d 1405, 1408 (11th Cir. 1998) (cleaned up). A defendant, moreover, has no right to present "nullification argument[s] to the jury," *United States v. Roberts*, 215 F. App'x 842, 847 (11th Cir. 2007), or irrelevant evidence "intended to inspire a jury to exercise nullification," *United States v. Moss*, 297 F. App'x 839, 841 (11th Cir. 2008), or to "induc[e] decision on a purely emotional basis," Fed. R. Evid. 403 advisory committee's note.

The Court should preclude the defense from inviting nullification, including by (1) raising the consequences of a conviction or (2) offering evidence about the defendant's personal characteristics not relevant to guilt or innocence.

First, the defendant should not raise the consequences this case has had (or a conviction would have) for him personally or professionally. The jury has no role in

imposing penalties, and the consequences of a conviction are not its concern. *See United States v. Thigpen*, 4 F.3d 1573, 1577 (11th Cir. 1993) ("[J]uries are not to be informed of or concerned with the consequences of their verdicts."). Injecting such issues "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579 (1994); *see United States v. Rushin*, 844 F.3d 933, 939-40 (11th Cir. 2016) (trial court properly excluded questioning that would have revealed the sentence range for defendants, thereby raising the risk of jury nullification).

Second, the defendant should not offer irrelevant evidence about his family or religious background, community service, health conditions, age, or similar personal factors in a bid for jury sympathy. To be sure, the defendant may offer evidence of a "pertinent trait" under Rule 404, using the methods specified in Rule 405. But to be pertinent, a trait should be "relevant to the offense charged." *United States v. John*, 309 F.3d 298, 303 (5th Cir. 2002). Personal characteristics, such as the defendant's family background, religious faith, and similar topics do not fit that bill. Instead, they are invitations to nullify. For example, in *United States v. Joseph*, the Eleventh Circuit held that the trial court had properly sustained an objection to counsel's comment on the defendant's "honor and social contributions," and reasoned that such "comments . . . were part of his jury nullification efforts." 567 F.

App'x 844, 849 (11th Cir. 2014). This Court should exclude similar evidence or argument at trial.

                Respectfully submitted,

                PRIM F. ESCALONA
                United States Attorney

                */s/ Ryan S. Rummage*
                RYAN S. RUMMAGE
                BRETT A. JANICH
                Assistant United States Attorneys

12

## CERTIFICATE OF SERVICE

I certify that, on November 26, 2024, I served counsel for the defendant by filing this document via the CM/ECF system, which sends a copy to all counsel of record.

                                          */s/ Ryan S. Rummage*
                                          RYAN S. RUMMAGE
                                          Assistant United States Attorney